**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

**KELLY WALKER and WILLIAM REICH, on behalf of the Owens & Minor 401(k) Savings and Retirement Plan, and on behalf of all similarly situated participants and beneficiaries of the plan,**

**Plaintiffs,**

**v.**

**OWENS & MINOR, INC.; JOHN and JANE DOES 1-30 IN THEIR CAPACITIES AS FIDUCIARIES;**

**Defendants.**

**CASE NO:** 3:26-cv-379

**CLASS ACTION COMPLAINT**

## I. INTRODUCTION

1. Plaintiffs Kelly Walker and William Reich ("Plaintiffs"), in their individual capacities, and on behalf of all other similarly situated participants, their beneficiaries and estates, and on behalf of Owens & Minor 401(k) Savings and Retirement Plan ("the Plan") bring this action under 29 U.S.C. §§ 1132(a)(2) and (3) & 1109(a) against Defendants (1) Owens & Minor, Inc. (the "Company"), and (2) John and Jane Does 1-30 in their capacities as fiduciaries (collectively, "Doe Defendants") (collectively, the Company and the Doe Defendants will be referred to as "Defendants" or "Fiduciaries"), to remedy Defendants' breaches of fiduciary duties and other violations of the Employee Retirement Income & Security Act of 1974, as amended (ERISA), U.S.C. 29 § 1001, *et seq*.

2. Defined contribution plans that are qualified as tax-deferred vehicles have become the primary form of retirement savings in the United States and, as a result, America's *de facto*

retirement system. Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk of high fees associated with the investment of pension plan assets, defined contribution plans operate in a manner by which participants bear the risk of high fees.

3. As fiduciaries of the Plan, at all times relevant to this Complaint, Defendants were obligated to act prudently. Defendants violated their fiduciary duties by initially selecting, and consistently retaining, higher cost investment share classes which materially reduced Plan participants' retirement funds as compared to readily available alternatives.

4. Defendants further breached their fiduciary duties by failing to prudently monitor the Plan's recordkeeping and administrative ("RKA") expenses. The excessive cost of the fees bore no rational relationship to the actual cost of services rendered and was inconsistent with Defendants' obligation to ensure that Plan expenses were reasonable.

5. As a result of these breaches of fiduciary duty, Plaintiffs and the proposed class lost millions of dollars in Plan assets.

6. To remedy Defendants' fiduciary breaches, as further described below, Plaintiffs bring this action individually and on behalf of the Plan to obtain the relief provided under ERISA § 409, 29 U.S.C. § 1109, for losses suffered by the Plan, from six years prior to the filing of this complaint to the date of judgment (the "Class Period") and for other appropriate equitable and injunctive relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

## II. JURISDICTION AND VENUE

7. This Court has exclusive jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA Section 502, 29 U.S.C. § 1132(e)(1).

8. Venue lies in this district pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because the Company resides in this district (with a principal place of business in Glen Allen, VA), the Plan is administered in this district, and at least one of the alleged breaches took place in this district.

## III. THE PARTIES

### A. Plaintiffs

9. Plaintiffs bring this suit individually, on behalf of the Plan, and on behalf of a class of participants and beneficiaries of the Plan. At all relevant times, and during the Class Period, Plaintiffs, by virtue of employment with The Company and participation in the Plan, were participants as defined by ERISA § 3(7), 29 U.S.C. § 1002(7).

10. At all relevant times during the Class Period, Plaintiff Kelly Walker was invested in share class "K" of the Fidelity Freedom Target Date Fund series ("Fidelity TDF K") provided by Defendants in the Plan.

11. At all relevant times, during the Class Period, Plaintiff William Reich was invested in Fidelity Contrafund Commingled Pool Class "A" ("Fidelity Contrafund A") provided by Defendants in the Plan.

12. As Plan participants and holders of the disputed funds, Fidelity TDF K and Fidelity Contrafund A, Plaintiffs have standing to bring claims on behalf of the Plan pursuant to 29 U.S.C. §1132(a)(2), seeking appropriate relief under 29 U.S.C. §1109.

13. Plaintiffs have standing to bring claims on behalf of all participants and beneficiaries who invested in the Plan because the alleged harms to those participants and beneficiaries can be traced to the same challenged conduct: the imprudent process that Defendants

used to select, monitor, and retain the higher cost share classes, higher RKA costs, and otherwise administer the Plan.

14. As a result of Defendants' mismanagement of the Plan and violations of ERISA, Plaintiffs were subject to excessive fees and suffered financial losses.

**B. Defendants**

15. The Company is a for-profit limited liability company, with a principal place of business at 10900 Nuckols Rd, Ste 400, Glen Allen, VA 23060. On information and belief, the Company has over 17,000 employees.

16. The Company is the sponsor of the Plan per ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B); a party in interest under ERISA § 3(14)(C), 29 U.S.C. § 1002(14)(C); and a Plan fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(2)(A), to the extent that it exercised discretion over the administration and management of the Plan and/or control of Plan assets.

17. At all relevant times, the Company was the Plan administrator under ERISA § 3(16), 29 U.S.C. § 1002(16); a party in interest under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A); and Plan fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), to the extent that it had or exercised discretion over the administration or management of the Plan and/or control of Plan assets.

18. At all relevant times, Defendants John Does 1-30, as members of the Board of Directors, and as the governing body of the Plan Sponsor and Administrator, were parties-in-interest under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A), and fiduciaries of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), to the extent that they had or exercised discretionary authority respecting the administration or management of the Plan, and/or control of Plan assets.

## IV. THE PLAN

19. The Plan is a retirement plan within the meaning of 29 U.S.C. § 1002(2)(A), a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), and a qualified plan under 26 U.S.C. § 401(k).

20. The Plan is subject to the provisions of ERISA.

21. The Plan is a single-employer 401(k) and profit-sharing plan. The Plan covers substantially all employees of the Company and its subsidiaries. The Company is the Plan sponsor and Administrator.

22. On information and belief, the assets of the Plan are held by Fidelity Institutional Asset Management Trust Company.

23. CapTrust is the investment advisor for the Plan.

24. The Plan qualified as a "Mega"[1] plan during all relevant times. Entering 2020, the Plan had 9,766 participants and $443,688,963 in total assets. As of the end of 2024, the Plan had $993,500,551 in assets and 17,272 total Plan participants.

25. According to its Investment Policy Statement, the Plan was established to provide eligible employees with the opportunity for a long-term accumulation of retirement saving through employee contributions and, if applicable, employer contributions, as well as associated investment earnings. The Plan's investment methodology was described as designed to "support sound fiduciary decisions that are in the sole interests of participants and beneficiaries."[2]

---

[1] Defined contribution retirement plans are typically classified as: "Small" plans ($25 million or less); "Medium" plans ($25 million to $100 million); "Large" plans ($100 million to $500 million); and "Mega" plans ($500 million or more). Source: Morningstar "Retirement Plan Landscape Report" (March 2022).

[2] See CapTrust Financial Advisors Investment Policy Monitoring (Scoring) System Methodology at 4.

26. At all relevant times the Plan permitted participants to allocate their retirement assets into around seventeen pre-selected investment options.

27. Each mutual fund investment option available under the Plan is offered through a specific share class that has been pre-selected by the Plan's fiduciaries on behalf of participants.

28. Mutual funds typically offer multiple share classes—such as "retail" and "institutional." Mutual fund providers generally seek to attract larger or institutional investors by offering lower-cost share classes compared to those available to individual retail investors. Retail share classes of mutual funds are designed for small individual investors, while institutional share classes are designed for large and/or institutional investors. Retail share classes are identical to institutional share class funds in every respect, except for materially higher fees.[3] The costs may differ among share classes, but the investment product is identical—the managers, investment styles, and stocks are not merely similar, but identical.

29. During the majority of the Class Period, the Plan offered the Fidelity Freedom Target Date Fund series as the Plan's Qualified Default Investment Alternative ("QDIA"); in other words, a participant who did not provide direction on investment was automatically invested in Fidelity TDF K. As such, Fidelity TDF K comprised over half of the Plan assets from 2020 to 2024.

30. In 2024, the Fiduciaries switched the QDIA to a collective investment trust ("CIT") called the Fidelity Freedom Index Commingled Pool (the "Fidelity CIT").

[3] The U.S. Department of Labor (DOL) has stated that "[o]ne estimate is that the typical institutional fund has an expense ratio that is 50 basis points lower than comparable retail funds." U.S. Dep't of Labor Pension & Welfare Ben. Admin., Study of 401(k) Plan Fees and Expenses § 2.4.1.3 (Apr. 13, 1998).

## V. DEFENDANTS' FIDUCIARY OBLIGATIONS

31. ERISA fiduciaries carry "the highest duty known to the law." *Brundle on behalf of Constellis Employee Stock Ownership Plan v. Wilmington Trust N.A.*, 241 F.Supp.3d 610, 633 (E.D.Va., 2017) (internal citation and quotation marks omitted).

32. ERISA imposes broad duties on ERISA fiduciaries, including the "'prudent person fiduciary obligation,' which requires a plan fiduciary to act 'with the care, skill, prudence, and diligence of a prudent person acting under similar circumstances.'" *Peters v. Aetna Inc.*, 2 F. 4th 199, 228 (4th Cir. 2021) (quoting *James v. Pirelli Armstrong Tire Corp*., 305 F.3d 439, 448–49 (6th Cir. 2002) and 29 U.S.C. §1104(a)(1)(B)).

33. As part of its fiduciary duty, the Defendants "ha[ve] a continuing duty to monitor [Plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). "A Plaintiffs may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* at 530. If an investment is imprudent, Defendants "must dispose of it within a reasonable time." *Id.* (citation omitted).

34. ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.

35. In addition, 29 U.S.C. § 1105(a)(2), establishes liability for a fiduciary who enabled the breach of a co-fiduciary, even if the fiduciary does not have knowledge of the other fiduciary's breach.

36. Under 29 U.S.C. § 1132(a)(2), a plan participant is authorized to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109.

### A. The Standard of Care for Prudent Fiduciaries Selecting and Retaining a Particular Share Class for a Mutual Fund

37. Courts have found a plausible breach of the duty of prudence may have occurred where fiduciaries offer and retain retail class mutual funds or annuities that carry higher expense ratios than identical institutional class shares of the same investments, rejecting the notion that the availability of low-cost options elsewhere in the plan excuses the alleged inclusion of higher cost, imprudent options. *See Hughes v. Northwestern University*, 595 U.S. 170 (2022), 172-177.

38. Mutual funds incur operating expenses (including management fees, administrative expenses, recordkeeping and some revenue-sharing arrangements) that are reflected as a percentage of the fund's average net assets (the "Expense Ratio" or "ER"). These expenses are deducted from the fund's investment returns; hence, the expenses are billed indirectly to the participants, deducted from the Plan assets and reflected in net investment performance. Retail share classes (or equivalently high-cost share classes) are often imprudent for larger or institutional investment portfolios where lower cost institutional share classes are available, because they impose unnecessary costs, including inflated expense ratios.

39. Mutual funds, moreover, are not static, and share classes change over time as lower share classes are issued. Therefore, a fiduciary with a prudent methodology will monitor and evaluate the share classes of the available mutual funds and have an established process to move a plan's assets into lower cost share classes as they become available. *Tibble*, 575 U.S. at 529.

40. Investing plan assets in higher-cost share classes harms participants not only by increasing expense ratios, but also by generating excessive indirect fees that do not reflect the value of any services provided and instead rise solely with the amount participants invest. The erosive effect of daily excessive fees and the resulting lost returns compound over time, substantially lowering the corpus of participants' retirement investments.

41. Furthermore, because fees are paid every day and credits are credited back often months later, any credits need not only offset the fee difference, but also the fee-drag difference on daily performance.

42. As stated by the SEC Office of Compliance Inspections and Examinations, a fiduciary investment advisor "has failed to uphold its fiduciary duty when it causes a client to purchase a more expensive share class of a fund when a less expensive class of that fund is available."[4]

43. Because most plan fiduciaries designate a selected TDF as the QDIA, the TDF and share class selected by a plan fiduciary will typically contain the majority of assets for most plan participants. For this reason, the selection of the TDF share class is one of the most important and impactful fiduciary decisions that must be performed with due diligence for selection and monitoring responsibilities.

## VI. FACTUAL ALLEGATIONS

### A. Defendants Failed to Follow a Prudent Process When Choosing to Select and Retain Higher Cost Share Classes of Identical Investments.

44. Here, the Plan fiduciaries wasted Plan assets by failing to (1) conduct a comprehensive review of the available share classes and select a reasonably priced share class of the funds for inclusion in the Plan menu; and/or (2) negotiate for a lower cost share class at any point following initial selection of the fund; which (3) caused damage to the Plan.

[4] "OCIE's 2016 Share Class Initiative", National Exam Program Risk Alert, Securities and Exchange Commission ("SEC"), Office of Compliance Inspections and Examinations, Vol. V, Issue 2 (July 13, 2016), ocie-risk-alert-2016-share-class-initiative.pdf.

**1. Initial Selection Error**

45. Prior to 2020, Defendants selected Fidelity TDF K as an investment option—and the Plan's QDIA—despite the long-standing availability of a materially identical, lower-cost share class, Fidelity Freedom Class K6 ("Fidelity TDF K6"), and other lower-cost options.

46. Fidelity TDF K is the second-highest cost share class available, generally trailing the highest expense ratio—the retail share class—by only a couple basis points ("bps").[5]

47. At all relevant times, Defendants had access to low-cost institutional share classes of mutual funds. They either met the minimum investment requirements for these funds or had the option to negotiate with the investment provider to waive the minimum investment requirements. Their continuing selection of the more expensive share class suggests they failed to do either.[6]

48. In selecting share classes with a higher fee, Defendants demonstrated a lack of prudence when selecting investments. A prudent fiduciary must have viable methodology to determine a prudent selection and should be able to spot the best share class options for a plan.

**2. Ongoing Monitoring Failure**

49. Following the imprudent selection, the Fiduciaries continuously maintained higher cost share classes when identical lower cost class shares of the same mutual funds were available. With the choice of two virtually identical investments—with the same assets, investment style, and management—Defendants *inexplicably chose* year-after-year to keep more expensive product.

[5] According to information pulled from the "Compare Funds" tool on Fidelity.com, using comparison of five different retail and institutional share classes from 2035 and 2040 vintages of the Fidelity Freedom TDF series.

[6] These and some other allegations are properly pleaded on information and belief as details of fiduciaries' internal records, internal deliberations, and negotiations are largely within Defendants' knowledge and control at the pleading stage, and courts permit ERISA plaintiffs to proceed on reasonable inferences drawn from circumstantial facts rather than requiring direct proof of the fiduciaries' internal process before discovery. See *Sacerdote v. New York University*, 9 F.4th 95 (2021). See also *Johnson v. Parker-Hannifin Corporation*, 122 F.4th 205 (2024).

Upon information and belief, the Plan Fiduciaries selected a higher fee share class that was *identical* in all material respects to a lower cost class, *without* proper analysis or professional advice.

50. During the Class Period, the less expensive Fidelity TDF K6 was available and easily identifiable to Defendants; all share classes and the related fees were disclosed in Fidelity's annual prospectus. Even a simple, quick review of the funds' prospectuses under consideration, would have uncovered the prudent alternative.

51. The inexpensive K6 share class had *no minimum investment* for retirement plans. Hence, the Company qualified for the better share class at all relevant times.

52. In their roles as fiduciaries, Defendants knew or should have known about the differences in share classes and that a superior alternative investment was readily available.

53. Despite having the opportunity and obligation to monitor and leverage their position to negotiate lower-cost share classes, as outlined below the Defendants imprudently chose to offer higher-cost fund share classes as investment options for the Plan.

54. Despite their ongoing duty to monitor Plan investments (as outlined herein), Defendants failed to select, transition to, or negotiate for the lower-cost share class for the majority of the Class Period.

55. Defendants imprudently and continuously caused the Plan and its participants to pay higher fees—exceeding those for which the Plan was eligible—for the *exact same* product they could have purchased with fewer Plan assets.

56. A prudent monitoring of the Plan investments would have investigated the obvious error in including a more expensive retail-like share class, rather than a cheaper institutional share class, and would have switched to the cheaper share class promptly. Defendants failed to do so.

**3. The Harm Resulting from the Share Class Selection and Monitoring Failure**

57. Defendants' actions were directly erosive to the Plan's growth. Defendants caused Plaintiffs and other Plan participants/beneficiaries harm: forcing them to pay higher fees and causing lost yield and returns due to the higher fees *with no added benefit*.

58. The following chart illustrates the expense ratios for each vintage[7] of the Disputed Share Class (share class K) as compared to the expense ratios for each vintage of Class K6 (the comparable institutional class). In the chart, the share class with a higher fee is highlighted in red, while the share class with a lower fee is highlighted in green.

[7] The investment objective of a target date fund series is to provide an asset allocation strategy that changes its asset allocation over time as investors get closer to their expected retirement date. The name of each fund in a target date series typically refers to its target date, which corresponds approximately to the investor's anticipated retirement date. For example, a fund with a name like "Retirement Fund 2040" or "Target 2040" is designed for individuals who intend to retire in or near the year 2040. Target retirement years are often offered in five-year increments. The specific retirement date of a fund in a target date series is often referred to as a "vintage." Unless a participant selects a different vintage, they are automatically placed into a vintage based on their birth year.

**Share Class & Expense Ratio by Year**

| Ticker | Fund Name | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| FNSHX | Fidelity Freedom Retirement K | 0.41% | 0.41% | 0.41% | 0.41% | 0.41% | 0.42% | 0.41% |
| FYTKX | Fidelity Freedom Retirement K6 | 0.37% | 0.37% | 0.37% | 0.37% | 0.36% | 0.24% | 0.24% |
| | ***Difference*** | ***0.04%*** | ***0.04%*** | ***0.04%*** | ***0.04%*** | ***0.05%*** | ***0.18%*** | ***0.17%*** |
| FSNKX | Fidelity Freedom 2010 K | 0.46% | 0.45% | 0.45% | 0.44% | 0.44% | 0.43% | 0.42% |
| FOTKX | Fidelity Freedom 2010 K6 | 0.39% | 0.39% | 0.38% | 0.38% | 0.38% | 0.25% | 0.25% |
| | ***Difference*** | ***0.07%*** | ***0.06%*** | ***0.07%*** | ***0.06%*** | ***0.06%*** | ***0.18%*** | ***0.17%*** |
| FSNLX | Fidelity Freedom 2015 K | 0.50% | 0.49% | 0.48% | 0.48% | 0.47% | 0.46% | 0.45% |
| FPTKX | Fidelity Freedom 2015 K6 | 0.41% | 0.41% | 0.40% | 0.40% | 0.40% | 0.27% | 0.26% |
| | ***Difference*** | ***0.09%*** | ***0.08%*** | ***0.08%*** | ***0.08%*** | ***0.07%*** | ***0.19%*** | ***0.19%*** |
| FSNOX | Fidelity Freedom 2020 K | 0.53% | 0.52% | 0.52% | 0.51% | 0.50% | 0.50% | 0.49% |
| FATKX | Fidelity Freedom 2020 K6 | 0.43% | 0.43% | 0.42% | 0.42% | 0.42% | 0.30% | 0.29% |
| | ***Difference*** | ***0.10%*** | ***0.09%*** | ***0.10%*** | ***0.09%*** | ***0.08%*** | ***0.20%*** | ***0.20%*** |
| FSNPX | Fidelity Freedom 2025 K | 0.57% | 0.56% | 0.55% | 0.55% | 0.54% | 0.53% | 0.52% |
| FDTKX | Fidelity Freedom 2025 K6 | 0.45% | 0.45% | 0.44% | 0.44% | 0.44% | 0.34% | 0.33% |
| | ***Difference*** | ***0.12%*** | ***0.11%*** | ***0.11%*** | ***0.11%*** | ***0.10%*** | ***0.19%*** | ***0.19%*** |
| FSNQX | Fidelity Freedom 2030 K | 0.60% | 0.59% | 0.59% | 0.58% | 0.57% | 0.57% | 0.56% |
| FGTKX | Fidelity Freedom 2030 K6 | 0.47% | 0.47% | 0.46% | 0.46% | 0.45% | 0.37% | 0.36% |
| | ***Difference*** | ***0.13%*** | ***0.12%*** | ***0.13%*** | ***0.12%*** | ***0.12%*** | ***0.20%*** | ***0.20%*** |
| FSNUX | Fidelity Freedom 2035 K | 0.64% | 0.63% | 0.62% | 0.62% | 0.61% | 0.60% | 0.59% |
| FWTKX | Fidelity Freedom 2035 K6 | 0.49% | 0.49% | 0.48% | 0.48% | 0.47% | 0.41% | 0.40% |
| | ***Difference*** | ***0.15%*** | ***0.14%*** | ***0.14%*** | ***0.14%*** | ***0.14%*** | ***0.19%*** | ***0.19%*** |
| FSNVX | Fidelity Freedom 2040 K | 0.64% | 0.64% | 0.64% | 0.64% | 0.64% | 0.64% | 0.63% |
| FHTKX | Fidelity Freedom 2040 K6 | 0.50% | 0.49% | 0.49% | 0.49% | 0.49% | 0.44% | 0.44% |
| | ***Difference*** | ***0.14%*** | ***0.15%*** | ***0.15%*** | ***0.15%*** | ***0.15%*** | ***0.20%*** | ***0.19%*** |
| FSNZX | Fidelity Freedom 2045 K | 0.64% | 0.64% | 0.64% | 0.64% | 0.64% | 0.64% | 0.64% |
| FJTKX | Fidelity Freedom 2045 K6 | 0.50% | 0.49% | 0.49% | 0.49% | 0.49% | 0.45% | 0.45% |
| | ***Difference*** | ***0.14%*** | ***0.15%*** | ***0.15%*** | ***0.15%*** | ***0.15%*** | ***0.19%*** | ***0.19%*** |
| FNSBX | Fidelity Freedom 2050 K | 0.64% | 0.64% | 0.64% | 0.64% | 0.64% | 0.64% | 0.64% |
| FZTKX | Fidelity Freedom 2050 K6 | 0.50% | 0.49% | 0.49% | 0.49% | 0.49% | 0.45% | 0.45% |
| | ***Difference*** | ***0.14%*** | ***0.15%*** | ***0.15%*** | ***0.15%*** | ***0.15%*** | ***0.19%*** | ***0.19%*** |
| FNSDX | Fidelity Freedom 2055 K | 0.64% | 0.64% | 0.64% | 0.64% | 0.64% | 0.65% | 0.64% |
| FCTKX | Fidelity Freedom 2055 K6 | 0.50% | 0.49% | 0.49% | 0.49% | 0.49% | 0.45% | 0.45% |
| | ***Difference*** | ***0.14%*** | ***0.15%*** | ***0.15%*** | ***0.15%*** | ***0.15%*** | ***0.20%*** | ***0.19%*** |
| FNSFX | Fidelity Freedom 2060 K | 0.64% | 0.64% | 0.64% | 0.64% | 0.64% | 0.65% | 0.64% |
| FVTKX | Fidelity Freedom 2060 K6 | 0.50% | 0.49% | 0.49% | 0.49% | 0.49% | 0.45% | 0.45% |
| | ***Difference*** | ***0.14%*** | ***0.15%*** | ***0.15%*** | ***0.15%*** | ***0.15%*** | ***0.20%*** | ***0.19%*** |
| FFSDX | Fidelity Freedom 2065 K | | 0.65% | 0.64% | 0.64% | 0.64% | 0.65% | 0.64% |
| FFSZX | Fidelity Freedom 2065 K6 | | 0.50% | 0.49% | 0.49% | 0.49% | 0.45% | 0.45% |
| | ***Difference*** | | ***0.15%*** | ***0.15%*** | ***0.15%*** | ***0.15%*** | ***0.20%*** | ***0.19%*** |

59. For each year of the Class Period, and for every vintage, the Disputed Share Class (the K share class) had substantially higher expense ratio than the ratio for the Fidelity TDF K6.

60. Nearly every vintage of the Fidelity TDF K6 *decreased in cost* by several bps during the Class Period, whereas every vintage of the K class either remained stable or decreased slightly during the Class Period. The difference in cost between K6 and K grew throughout the class period.

61. The fact that Defendants did not switch to the Fidelity TDF K6 (or, alternatively, any other available lower-cost share classes)—particularly when Fidelity TDF K6 continued to get cheaper—is a testament to their lack of process in evaluating and selecting/changing share classes.

62. In 2024, Defendants belatedly replaced the Plan's QDIA, removing the higher-cost Fidelity TDF K suite and substituting the Fidelity CIT (ER 0.07%), a passive CIT with no embedded revenue sharing. The availability and ultimate adoption of this lower-cost option demonstrate that a prudent alternative existed for years, rendering Defendants' prolonged failure to act imprudent under ERISA.

63. Defendants have not offered any insight into their imprudent decision to offer Fidelity TDF K for most of the Class Period instead of the identical, but cheaper, Fidelity TDF K6, or any other comparable, less expensive alternative like the Fidelity CIT. Defendants' failure to monitor and evaluate available share classes reflects Defendants' imprudent or absent processes in evaluating and retaining investment share classes for the Plan.

64. This share class selection error persisted in the plan for many years. Such a blatant failure in oversight is indicative of an imprudent process or no process at all in reviewing and monitoring share class selections.

65. Defendants breached their fiduciary duties by permitting participant assets to remain invested in a significantly more expensive share class when a lower-cost alternative was available, without providing any corresponding benefit to plan participants.

66. The failure to select far lower-cost share classes for the Plan's mutual fund options—share classes that are identical in all respects (portfolio manager, underlying investments, and asset allocation), except for cost—demonstrates that Defendants acted imprudently.

67. At a minimum, Defendants failed to consider the size and purchasing power of the Plan when selecting share classes and failed to engage in a prudent process for the selection, monitoring, and retention of share classes of mutual funds.

68. Had Defendants employed a prudent monitoring process, the Plan would have millions more in assets.

**B. The Defendants Similarly Failed to Select the Cheaper Share Class for Several Additional Funds.**

69. Defendants also failed to investigate, identify issues with, and select better-value[8] share classes for several additional disputed funds chosen as investment options before or during the Class Period, such as:

a. Fidelity Contrafund "K" share class, with an ER range of ~0.77%-0.67%, instead of better available share class "K6" (0.45% ER) (comparison shown in **Table 1**, below);

b. Fidelity Contrafund "A" share class, with an ER of ~0.43%, instead of better available alternative share class "S" with an ER range of ~0.30% (from 2021-2024) (comparison shown in **Table 2**, below);

c. Galliard Stable Return Fund Class C (~0.37% ER) instead of Class E (~0.32% ER) (comparison shown in **Table 3**, below);

d. Victory Sycamore Small Company Opportunity Class I (0.89% ER) instead of R6 (0.54% ER) (Comparison shown in **Table 4** below).[9]

[8] Again, aside from the cost and turnover rate, the products are identical on the share class level.
[9] There may be other funds affected funds as well because the same flawed process was applied across the Plan, but this information is not available for all funds at this time.

70. The following charts compare the ERs for each different fund mentioned above. The comparison charts demonstrate the Plan funds' materially higher cost over the comparable share classes.

**Table 1**

| Name | Manager Tenure | Inception Date | Assets (Millions) | Turnover Rates | Minimum Investment | Load (Y/N) | Expense Ratio Net † | Expense Ratio Gross ‡ |
|---|---|---|---|---|---|---|---|---|
| ** Fidelity® Contrafund® Class K (FCNKX) | 36 years | 05/17/1967 | $157,803.70 | 29% 12/31/2025 | $0 | N | 0.67% | 0.67% |
| * Fidelity® Contrafund® K6 (FLCNX) | 9 years | 05/25/2017 | $33,565.28 | 37% 12/31/2025 | $2,500 | N | 0.45% | 0.45% |

[10]

**Table 2**

| Fidelity Contrafund Commingled Pool Fee Comparison | Class A | Class S |
|---|---|---|
| Total Annual Operating Expenses | 0.43% | 0.30% |

[11]

**Table 3**

| Galliard Stable Return Fund Comparison | Fund C | Fund E |
|---|---|---|
| CUSIP | 949907505 | 949907703 |
| Total Expense Ratio | 0.37% | 0.32% |
| Blended Yield (after fees) | 3.17% | 3.22% |

[12]

---

[10] From: Fidelity "Mutual Funds Research: Compare Funds – Management & Fees" Tool (2026).
[11] Compiled from: Vanguard Institutional Investor Resources - "Fidelity Contrafund Commingled Pool Class A" (September 30, 2024); and the Ohio Public Employees Deferred Compensation Program investment option summary - "Fidelity Contrafund Commingled Pool – Class S."
[12] Compiled from: Galliard Capital Management fund fact sheets — "Galliard Stable Return Fund C" (CUSIP 949907505, as of December 31, 2025); and "Galliard Stable Return Fund E" (CUSIP 949907703, as of December 31, 2025).

**Table 4**

| Shareholder Fees (paid directly from your investment) | Class A | Class C | Class I | Class R | Class R6 | Class Y |
|---|---|---|---|---|---|---|
| Maximum Sales Charge (Load) Imposed on Purchases (as a percentage of offering price) | 5.75% | None | None | None | None | None |
| Maximum Deferred Sales Charge (Load) (as a percentage of the lower of purchase or sale price) | None[1] | 1.00%[2] | None | None | None | None |
| **Annual Fund Operating Expenses** (expenses that you pay each year as a percentage of the value of your investment) | | | | | | |
| Management Fees | 0.45% | 0.45% | 0.45% | 0.45% | 0.45% | 0.45% |
| Distribution and/or Service (12b-1) Fees | 0.25% | 1.00% | 0.00% | 0.50% | 0.00% | 0.00% |
| Other Expenses | 0.19% | 0.25% | 0.13% | 0.14% | 0.09% | 0.21% |
| Total Annual Fund Operating Expenses | 0.89% | 1.70%[3] | 0.58% | 1.09% | 0.54% | 0.66% |

[1] A contingent deferred sales charge of 0.75% may be imposed on Class A shares with respect to purchases of $500,000 or more that are redeemed within 18 months of purchase. For additional information, see the section titled *Choosing a Share Class*. [13]

71. All the above-mentioned alternative share classes were within the Plan's institutional reach and had minimum initial purchase amounts or waivers available in accordance with the Plan's mega size.

72. All the above-mentioned alternative share classes were introduced prior to or within the Class Period.

73. As outlined in this Complaint, Defendants had a continuing duty to monitor investments and remove imprudent ones.

74. Nonetheless, Defendants failed to properly monitor the investments in the Plan and readjust the unnecessarily expensive share classes, continuing to offer these funds as Plan options

[13] Source: Victory Sycamore Small Company Opportunity Fund Prospectus (2026). Total Annual Fund Operating Expenses reflect net expenses after applicable contractual fee waivers and/or reimbursements as presented in the fund's summary prospectus for the period shown.

instead of any of the materially identical, but lower-priced, institutional-class mutual funds or CITs.

75. As with Fidelity TDF K series, Defendants continually chose to overpay for the identical product with Participant money, indicating a plain lack of prudent process in evaluating and retaining share classes. The result was diminished returns to participants.

### C. Defendants Failed to Follow a Prudent Process in Allowing the Plan to Pay Excessive Recordkeeping and Administrative Costs

76. The Plan had both the bargaining power and the means to implement prudent processes to monitor the Plan's recordkeeping fees. With an average of 10,776 participants and approximately $652 million in assets during the Class Period, the Plan is among the most attractive clients for any recordkeeper.

77. Defendants squandered that bargaining power. As detailed below, Defendants allowed Fidelity Institutional—the Plan's recordkeeper—to collect recordkeeping compensation well above what the market charged for materially identical services, with no meaningful fiduciary oversight.

78. Plan fiduciaries wasted Plan assets by failing to control RKA costs. Defendants failed to negotiate reasonable RKA costs commensurate with the Plan's significant bargaining power, especially considering a continuing trend of fee reduction in the financial services industry. These failures caused financial harm to the Plan and lowered participants' retirement balances.

#### 1. RKA Services for Retirement Plans; Commoditization and Pricing

79. The term "recordkeeping" is a catchall for the suite of administrative services typically provided to a defined contribution plan: maintaining participant accounts, processing transactions, and administering the plan in compliance with ERISA and the Internal Revenue Code. For large plans, these services are a commodity.

80. There are two categories of recordkeeping services. *First*, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services: (a) Basic account recordkeeping (*e.g.*, demographic, source, investment and vesting records); (b) Multi-channel participant and plan sponsor access (*e.g.*, phone, web); (c) Daily participant transaction accounting (*e.g.*, purchases, redemptions, exchanges); (d) Payroll service (*e.g.*, hardships, in-service withdrawals, termination distributions); (e) Participant tax reporting services (*e.g.*, IRS Form 1099-R); (f) Participant confirmations, statements, and standard notices; (g) Plan-level reporting and annual financial package (excluding IRS Form 5500); (h) Participant education (*e.g.*, newsletters, web articles, standard communication materials); and (i) Plan consulting (*e.g.*, preapproved document services, operational materials).

*81.* *Second*, recordkeepers offer à la carte services such as loan processing and brokerage with separate per-transaction fees.

82. To the extent that recordkeepers offer certain services on an à la carte basis in addition to the bundled RKA services, any differences in the usage and fees for these à la carte services have an immaterial impact on the total RKA fees charged to large plans.

83. "It's no secret to retirement industry professionals and fiduciaries that recordkeeping services are fungible;"[14] indeed, industry experts have long maintained that for large retirement plans, prudent fiduciaries should treat RKA services as a commodity when negotiating with recordkeepers. As one industry publication has explained: "Custody and recordkeeping are

[14] Lauren K. Valastro, *How Misapplying Twombly Erodes Retirement Funds*, 32 Geo. Mason L. Rev. 421 (2025).

'commodity' services. Like any commodity, given materially equal quality, the key benchmark for these services is price. The cheaper you can find competent custody and recordkeeping services, the better for participants."[15]

84. The recordkeeping industry itself has also long recognized that RKA services for large plans are commoditized. On March 27, 2023, the National Association of Plan Advisors ("NAPA"), which describes itself as "the only advocacy group exclusively focused on the issues that matter to retirement plan advisors,"[16] surveyed its members and posed the question: "Is recordkeeping a commodity?"[17] The results, published on March 31, 2023, were unambiguous: 71% of all respondents agreed that the services provided by recordkeepers to retirement plans are commodities.[18] And of the subset of respondents who were themselves recordkeepers or third-party administrators, 65% agreed these services are commodities.

85. The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.[19] When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base,

---

[15] Eric Droblyen, *Evaluating 401(k) Providers: Separating Commodity from Value-Added Services*, https://www.employeefiduciary.com/blog/evaluating-401k-providers-separating-commodity-value-added-services (Feb. 10, 2015).

[16] About Us, NAPA-Net, https://www.napa-net.org/about/.

[17] Nevin E. Adams, Is Recordkeeping a "Commodity?", NAPA-Net (Mar. 27, 2023), https://www.napa-net.org/news/2023/3/recordkeeping-commodity/

[18] Nevin E. Adams, J.D., READER RADAR: Service (Still) Separates Recordkeepers, NAPA-Net (Mar. 30, 2023), https://www.napa-net.org/news/2023/3/reader-radar-service-still-separates-recordkeepers/.

[19] *See* Study of 401(k) Plan Fees and Expenses, Economic Systems, Inc. (submitted to U.S. Department of Labor, Pension and Welfare Benefits Administration, Apr. 13, 1998), https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases.").

which reduces the per-participant cost. As a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increases, the average cost per participant decreases. Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.[20]

86. Recordkeepers compete on price, not on the substance of the core services they provide, because those core services are materially identical across providers. And because the RKA offerings provided by recordkeepers are materially identical commodities, it is the standard and prevailing practice for retirement plan fiduciaries and advisors to request quotes by asking what the recordkeeper's revenue requirement is on a per-participant basis for providing the bundled RKA services.

87. "Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble,* 575 U.S. at 525. Accordingly, Plan fiduciaries must also "avoid unwarranted costs" by remaining informed about the "availability and continuing emergence" of alternative investment strategies and service providers that may offer materially different pricing. Restatement (Third) of Trusts ch. 17, intro. note (2007); see also Restatement (Third) of Trusts § 90 cmt. b (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").

88. Only reasonable compensation can be paid for necessary services under ERISA. Revenue-sharing to subsidize fees reduces an investment's daily returns, making recordkeeping and other administrative costs interdependent with plan participant returns. See *Tibble v. Edison*

---

[20] *See* Mercer, *Defined Contribution Plan Fee Practices* (2024), https://www.mercer.com/assets/us/en_us/shared-assets/local/attachments/pdf-dc-plan-fee-practices.pdf.

*Int'l,* 07 cv 5359 (SVW)(AGRx), 2017 WL 3523737, at *12-13 (C.D. Cal. Aug. 16, 2017) (determining a prudent fiduciary would switch to identical lower-cost share classes immediately).

89. For this reason, prudent plan fiduciaries following the standard of care treat the services provided by recordkeepers as a commodity when ensuring that they pay only reasonable fees for those services. This approach achieves the best results for the exclusive benefit of plan participants as required by ERISA, because it enables objective, apples-to-apples comparisons of recordkeeping pricing across providers and eliminates the ability of an incumbent recordkeeper to justify excessive fees by claiming illusory service differentiation.

90. Because, for all practical purposes, RKA services are treated as a commodity by prudent plan fiduciaries, fee comparisons are used by prudent plan fiduciaries to understand the range of RKA fees paid in the market.

91. For example, prior to and throughout the class period some of the largest and well-known retirement plan advisors such as CapTrust, RPAG, and NEPC conduct benchmarking analyses and request for information ("RFI") and request for proposal ("RFP") exercises as standard fiduciary practices to determine whether plan sponsors are paying reasonable recordkeeping fees.

92. Thus comparisons of the total RKA fees paid by similarly sized plans are meaningful and probative of the reasonableness of any particular plan's fees.

**2. The Standard of Care for Monitoring RKA Fees**

93. ERISA's duty of prudence does not end when a fiduciary selects a service provider; it imposes a *continuing* obligation to monitor the plan's investments and service arrangements and remove imprudent ones. *Hughes*, 595 U.S. at 176. On remand, the Seventh Circuit made clear that "fiduciaries who fail to monitor the reasonableness of plan fees and fail to take action to mitigate excessive fees—such as by adjusting fee arrangements, soliciting bids, consolidating

recordkeepers, negotiating for rebates—may violate their duty of prudence." *Hughes v. Northwestern*, 63 F.4th 615, 625–26 (7th Cir. 2023).

94. The duty to monitor fees applies not only at the point of initial selection but at regular intervals thereafter. A recordkeeper's fees that were reasonable when the plan first engaged the provider may become excessive over time as the plan's assets grow, as new market entrants drive down pricing, or as technology reduces the cost of providing services. Accordingly, fiduciaries must reassess the reasonableness of recordkeeping compensation on an ongoing basis, and the failure to do so supports a claim for breach of the duty of prudence. *Tibble*, 575 U.S. at 529; *see also Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (affirming district court's ruling that the defendants "breached their fiduciary duties by failing to monitor and control recordkeeping fees").

95. The standard of care requires not only benchmarking but also conducting a competitive RFP for recordkeeping services every three to five years. Leading retirement plan advisory firms, including CAPTRUST, RPAG, and NEPC, treat periodic competitive bidding as a baseline fiduciary obligation, recommending "a more formal recordkeeper search and selection process conducted approximately every three to five years" regardless of whether the plan sponsor is satisfied with its existing provider.[21]

96. Consistent with these principles, Mercer's best practices guidance for defined contribution plan governance recommends that fiduciaries: (a) price administrative fees on a per-participant basis, so that fees are transparent and do not silently increase as plan assets grow; (b) benchmark and negotiate recordkeeping fees separately from investment management fees; (c)

[21] *See* CAPTRUST, *Understanding and Evaluating Retirement Plan Fees, Part One* (2024), Understanding and Evaluating Retirement Plan Fees, Part One

benchmark fees at least every other year; and (d) review services annually to identify opportunities to reduce costs.[22]

97. As set forth below, Defendants materially failed to adhere to the standard of care. The consequence of these failures is that Plan participants paid recordkeeping fees that were, in every year of the Class Period, multiples of the fees paid by similarly sized plans.

**3. Ongoing Monitoring Failure**

98. At all relevant times, Fidelity Institutional has served as the Plan's recordkeeper, providing the full suite of bundled recordkeeping and administrative services described above. The services Fidelity Institutional provides to the Plan are not materially different from those it provides to other large defined contribution plan clients or from the services other recordkeepers provide to similarly situated plans.

99. The Plan's RKA fees were deducted from participants' accounts.

100. From January 2020 to February 2026, Plaintiff Kelly Walker paid a total of $902.35 in upfront "administrative fees." Accounting for "revenue credits" of $437.52, Plaintiff paid over $77 a year on average during that period for administrative fees, well above the per-participant average.

101. From May through November 2024, Plaintiff William Reich paid a total of $389.15 in RKA fees, including $314.22 in "Recordkeeping Fee[s]" and $74.93 in "Administrative Fees" over just that six-month period. No revenue credits or RKA rebates were received.

---

[22] *See* Mercer, *Defined Contribution Plan Plan Fee Practices* (2024), Defined Contribution Plan Fee Practices

102. The excessive amount of RKA fees paid by both Plaintiffs is startling for a plan of this size. Plaintiff Walker paid $77 a year on average, even with revenue credits. Plaintiff Reich paid more than $389 dollars for just six months in 2024 and received no revenue credits.

103. The Plan's RKA compensation exceeded comparable plan rates in every year from 2019 to 2024. Comparing the Plaintiffs' recordkeeping fees to similarly situated plans confirms that the Plan paid significantly more than the market for materially identical services. **Table 5**, below, outlines the comparators.

**Table 5: Peer Plan RKA Fees 2019-2024**

| Plan Name | Participants | RKA Fees | RKA Fees Per Participant | Recordkeeper |
|---|---|---|---|---|
| **Plan Year 2019** | | | | |
| Archer Daniels Midland 401(K) Plan | 9,929 | $332,902 | $34 | Fidelity |
| Equifax Inc. 401(K) Plan | 8,211 | $164,658 | $20 | Fidelity |
| Hannaford Bros. Co. 401(K) Plan | 12,638 | $347,299 | $27 | Fidelity |
| Electronic Arts Inc. 401(K) Plan | 5,992 | $143,779 | $24 | Schwab |
| Terracon 401(K) and ESOP Plan | 7,074 | $218,780 | $31 | Schwab |
| **Plan Year 2020** | | | | |
| Archer Daniels Midland 401(K) Plan | 10,014 | $421,003 | $42 | Fidelity |
| Equifax Inc. 401(K) Plan | 8,529 | $148,842 | $17 | Fidelity |
| Hannaford Bros. Co. 401(K) Plan | 13,133 | $472,647 | $36 | Fidelity |
| Electronic Arts Inc. 401(K) Plan | 6,295 | $139,732 | $22 | Schwab |
| Terracon 401(K) and ESOP Plan | 7,332 | $211,933 | $29 | Schwab |
| **Plan Year 2021** | | | | |
| Archer Daniels Midland 401(K) Plan | 10,308 | $413,157 | $40 | Fidelity |
| Equifax Inc. 401(K) Plan | 9,798 | $386,842 | $39 | Fidelity |
| Hannaford Bros. Co. 401(K) Plan | 13,502 | $427,952 | $32 | Fidelity |
| Electronic Arts Inc. 401(K) Plan | 7,225 | $195,409 | $27 | Schwab |
| Terracon 401(K) and ESOP Plan | 7,769 | $266,251 | $34 | Schwab |
| **Plan Year 2022** | | | | |
| Archer Daniels Midland 401(K) Plan | 10,911 | $416,210 | $38 | Fidelity |
| Equifax Inc. 401(K) Plan | 10,770 | $510,610 | $47 | Fidelity |
| Hannaford Bros. Co. 401(K) Plan | 13,454 | $458,723 | $34 | Fidelity |
| Electronic Arts Inc. 401(K) Plan | 7,830 | $154,869 | $20 | Schwab |
| Terracon 401(K) and ESOP Plan | 8,226 | $304,590 | $37 | Schwab |
| **Plan Year 2023** | | | | |
| Archer Daniels Midland 401(K) Plan | 11,112 | $266,410 | $24 | Fidelity |
| Equifax Inc. 401(K) Plan | 10,009 | $311,312 | $31 | Fidelity |
| Hannaford Bros. Co. 401(K) Plan | 14,253 | $410,422 | $29 | Fidelity |
| Electronic Arts Inc. 401(K) Plan | 8,049 | $158,866 | $20 | Schwab |
| Terracon 401(K) and ESOP Plan | 8,972 | $330,895 | $37 | Schwab |
| **Plan Year 2024** | | | | |
| Archer Daniels Midland 401(K) Plan | 11,450 | $225,615 | $20 | Fidelity |

| | | | | |
|---|---|---|---|---|
| Equifax Inc. 401(K) Plan | 9,702 | $123,624 | $13 | Fidelity |
| Hannaford Bros. Co. 401(K) Plan | 14,731 | $468,374 | $32 | Fidelity |
| Electronic Arts Inc. 401(K) Plan | 8,154 | $157,445 | $19 | Schwab |
| Terracon 401(K) and ESOP Plan | 9,702 | $368,799 | $38 | Schwab |

104. These similarly situated comparator plans received materially identical RKA services but paid a fraction of the RKA fees that Plaintiffs paid.

105. These disparities, alone and in combination, support an inference of imprudence. *See Mator v. Wesco Distribution, Inc.*, 102 F.4th 172, 189–90 (3d Cir. 2024) (fee differential of 3.7 times a reasonable fee sufficient to state a claim); *Kruchten v. Ricoh USA, Inc.*, No. 23-1928, 2024 WL 3518308, at *4 (3d Cir. July 24, 2024) (2 times industry average supported a plausible claim).

106. Given the size of the Plan during the Class Period, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

107. The Plan should have been able to obtain per-participant recordkeeping fees of no more than $40 per participant per year, and likely even less. This fee is consistent with the average recordkeeping fees paid by similar plans in the country as demonstrated in the allegations above.

108. Had Defendants performed prudent monitoring, RFI, and RFP processes, the Plan would not have paid these excessive fees and participants' accounts would not have suffered these losses.

109. During the Class Period, the Plan's per-participant recordkeeping fees rose rather than fell—even as the Plan's participant count and asset base grew. This inverse relationship is a hallmark of a failed fee-monitoring process: a prudent fiduciary of a growing mega-plan will

typically use the plan's increasing bargaining power to drive per-participant fees down, not allow them to climb.

110. In their roles as fiduciaries, Defendants knew or should have known about the differences in fee types and that more competitive fee arrangements were readily available.

111. Despite having the opportunity and obligation to monitor and leverage their position to negotiate lower direct RKA fees, Defendants imprudently chose to charge participants materially higher fees than the standard market rates for mega plans.

112. Despite their ongoing duty to monitor and defray Plan costs (as outlined herein), Defendants failed to recognize this misalignment and prudently reselect, transition to, or negotiate for lower Plan fees for the duration of the Class Period.

113. Defendants should have conducted a reasonable RFP during the Class Period, produced benchmarking studies, and meaningfully reviewed total direct fees, while seeking competitive bids from other providers, or negotiating lower fees with the recordkeeper. No such process was undertaken; if undertaken, the RFP and benchmarks would have demonstrated a clear need for lower fees by late 2019 and all through the Class Period.

114. Based on the fees charged to Plaintiffs, Defendants imprudently and continuously caused the Plan and its participants to pay higher fees—exceeding those for which the Plan was eligible—for the *exact same* fungible services which the mega Plan could have obtained with fewer Plan assets.

**4. The Harm Resulting from the Failure to Monitor Plan Costs**

115. Defendants' actions (and inaction) were directly erosive to the Plan's growth. Defendants caused Plaintiffs and other Plan participants/beneficiaries harm: forcing them to pay higher fees and causing lost yield and returns due to the higher fees *with no added benefit*.

116. Had Defendants prudently monitored RKA fees the Plaintiffs and the Plan would have paid no more than the market-rate $20–$42 per person in every year and saved millions in overcharges and fee drag during the Class Period.

117. The difference between actual RKA compensation and a prudent market-rate fee constituted a loss to the Plan, borne by participants through reduced account balances and the elevated fees' drag on compounded investment returns.

## CLASS ALLEGATIONS

118. 29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of a plan to bring an action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109(a).

119. As an alternative to direct individual actions on behalf of the Plan, Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan.

120. Plaintiffs bring this action individually and on behalf of the Class, which is defined as: participants in and beneficiaries of the Plan but excluding Defendants; any person who was or is an officer, director, employee, or a shareholder of 5% or more of the equity of or is or was a partner, officer, director, or controlling person of, the spouse or children of any individual who is an officer, director or owner of 5% or more of the equity of; Plaintiffs' counsel; judges of the Court in which this case is pending and their current spouse and children; and the legal representatives, heirs, successors and assigns of any such excluded person.

121. The members of the Class are so numerous, consisting of thousands of members, not including their spouse beneficiaries, who, upon information and belief, are sufficiently dispersed geographically such that joinder of all members is impracticable. The issues of liability are common to all members of the Class and are capable of common answers as those issues.

122. Plaintiffs' claims are typical of the claims of other members of the Class because the claims arise from the same events, practices and/or courses of conduct described above.

123. Plaintiffs' claims are also typical of the claims of other members of the Class because the relief sought consists of requiring Defendants to make the Plan whole for any losses caused by their fiduciary breaches and to disgorge their profits to the Plan. Any such recovery from Defendants will be paid to the Plan and any relief will flow to all Class Members through their accounts in the Plan.

124. Plaintiffs will fairly and adequately represent and protect the interests of the Class.

125. Plaintiffs do not have any interests antagonistic to or in conflict with those of the Class.

126. Defendants have no unique defenses against Plaintiffs that would interfere with Plaintiffs' representation of the Class.

127. Plaintiffs are represented by counsel experienced in prosecuting ERISA class actions and with experience and expertise in litigation involving ERISA breaches of fiduciary duty and ERISA prohibited transactions.

128. The requirements of Fed. R. Civ. P. 23(b)(1)(A) are satisfied. Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the Plan and its participants. This action challenges whether Defendants acted consistently with their obligations under ERISA as to the Plan as a whole. As a result, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct relating to the Plan.

129. The requirements of Fed. R. Civ. P. 23(b)(1)(B) are also satisfied. Administration of an ERISA-covered plan requires that all similarly situated participants be treated the same. Resolving whether Defendants engaged in imprudence with respect to the Plan and fulfilled their fiduciary obligations to the Plan would, as a practical matter, be dispositive of the interests of the other participants in the Plan even if they are not parties to this litigation and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class.

130. The requirements of Fed. R. Civ. P. 23(b)(2) are satisfied as to the Class because Defendants have acted and/or failed to act on grounds generally applicable to the Class, making declaratory and injunctive relief appropriate with respect to the Class as a whole. This action challenges whether Defendants engaged in breaches of fiduciary duties which would be violations of ERISA as to the Plan as a whole and as to the Class as a whole. The relief sought in this case primarily consists of declarations that Defendants breached their fiduciary duties. As ERISA is based on trust law, any monetary relief consists of equitable monetary relief that would either flow directly by the declaratory or injunctive relief or flows as a necessary consequence of that relief.

131. The requirements of Fed. R. Civ. P. 23(b)(3) are also satisfied. The common questions of law and fact concern whether Defendants breached their fiduciary duties to the Plan. As the members of the Class were participants in that Plan, their accounts were affected by those breaches and violations. Common questions related to liability will necessarily predominate over any individual questions precisely because Defendants' duties and obligations were uniform to all participants and therefore all members of the Class. As relief and any recovery will be on behalf of the Plan, common questions as to remedies will likewise predominate over any individual issues.

132. A class action is a superior method to other available methods for the fair and efficient adjudication of this action. As the claims generally are brought on behalf of the Plan, resolution of the issues in this litigation will be efficiently resolved in a single proceeding rather than multiple proceedings, and each of those individual proceedings could seek recovery for the entire Plan. Class certification is a superior method of proceeding because it will obviate the need for unduly duplicative litigation, which might result in inconsistent judgments about Defendants' duties to the Plan.

133. The following factors set forth in Rule 23(b)(3) also support certification: a) The members of the Class have an interest in a unitary adjudication of the issues presented here for the reasons that this case should be certified under Rule 23(b)(1); b) No other litigation concerning this controversy has been filed by any other members of the Class; c) This District is the most desirable location for concentrating this litigation because: (i) the Company does business in this District; and (ii) a significant number of Class members are located in this District; d) There are no anticipated difficulties in managing this case as a class action.

134. Additionally, or in the alternative, this action may be certified as to particular issues under Rule 23(c)(4), including but not limited to Defendants' liability to the Class for their allegedly imprudent conduct.

## TIMELINESS

135. Within the six-year period prior to Plaintiffs filing this suit, Defendants violated one or more of their fiduciary obligations as described above.

136. At all relevant times during the Class Period, Defendants also made affirmative misrepresentations to participants about the amount of investment fees they were being charged.

137. At all relevant times during the Class Period, Defendants intentionally concealed their fiduciary breaches to prevent Plan participants from discovering them and avoiding the need to cure the deficiencies.

138. Plaintiffs did not acquire actual knowledge of these violations until shortly before commencing this action.

139. Consequently, Plaintiffs' claims in this action are timely under 29 U.S.C. § 1113.

**COUNT I: Breach of Fiduciary Duty of Prudence**
**(against all Defendants)**

140. Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

141. At all relevant times, Defendants were named and/or *de facto* fiduciaries of the Plan within the meaning of ERISA insofar as they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

142. ERISA mandates that fiduciaries act with prudence in the disposition of plan assets and selection and monitoring of investments, as well as in the monitoring and minimization of administrative expenses. 29 U.S.C. § 1104(a)(1)(B).

143. As fiduciaries of the Plan, Defendants were subject to the duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the Plan's fees and assets with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aim.

144. At all relevant times during the Class Period, Defendants breached their fiduciary duty of prudence in multiple respects as discussed above.

145. Based on reasonable inferences from the facts set forth in this Complaint, at all relevant times during Class Period, Defendants failed to have a proper system of review in place to ensure, among other things, that: (a) their selection and retention of investment share classes were prudent; and (b) plan expenses were reasonable and necessary.

146. At all relevant times during the Class Period, Defendants did not have adequate procedures in place to monitor investments and did not act in the best interests of the Plan participants. As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants suffered at least a million dollars in losses. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more funds available to them for their retirement.

147. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties and must restore any profits resulting from such breaches.

148. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in the Prayer for Relief.

**COUNT II: Breach of Co-Fiduciary Duties**
**(against all Defendants)**

149. Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

150. ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a plan liable for another fiduciary of the same plan's breach: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a

breach by such other fiduciary unless he makes reasonable efforts under the circumstances to remedy the breach.

151. In addition, 29 U.S.C. § 1105(a)(2), establishes liability for a fiduciary even if the fiduciary does not have knowledge of the other fiduciary's breach.

152. Each Defendant had the data and information available to them to discover or stop the fiduciary breaches alleged herein.

153. Each Defendant knew and had the necessary data and information available to them to know of opportunities for better performing investments.

154. Nevertheless, each Defendant chose to ignore, acquiesce, or participate in the ongoing breaches of fiduciary duty.

155. Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims, and request that the Court order or award the following relief:

A. Find and adjudge that the Defendants have breached their fiduciary duties, as described above;

B. Find and adjudge that the Defendants are personally liable to make good to the Plan the losses to the Plan resulting from each breach of fiduciary duty, and to otherwise

restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

C. Certify this action as a class action pursuant to Fed. R. Civ. P. 23, appoint the Plaintiffs as class representative, and appoint the law firm of Milberg, PLLC as class counsel;

D. Order Defendants to disgorge any profits they received as a result of the above breaches of fiduciary duty;

E. Impose a constructive trust over these profits;

F. Order the Defendants to make good to the Plan the losses resulting from each breach of fiduciary duty and to restore to the Plan any profits resulting from each breach of fiduciary duty;

G. Impose surcharge against the Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive, and/or in violation of ERISA

H. Apportion all amounts recovered for the Plan among the Plaintiffs and the Class;

I. Order that any amount to be paid to the Plan and/or accounts of Plaintiffs and Class members can be satisfied by using or transferring any breaching fiduciary's account (or the proceeds of that account) to the extent of that fiduciary's liability;

J. Require Defendants to pay attorneys' fees and the costs of this action pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1), or order the payment of reasonable fees and expenses to Plaintiffs' counsel on the basis of the common benefit or common fund doctrine (or other applicable law) out of any money or benefit recovered for the Class in this action;

K. Award pre-judgment and post-judgment interest; and

L. Award any other such relief the Court determines Plaintiffs and the Class are entitled to pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).

Dated: May 4, 2026

Respectfully submitted,

*/s/Lee A. Floyd*

Lee A. Floyd (VSB No. 88459)
Jonathan P. Floyd (VSB No. 88458)
**Floyd Law, PC**
626 E. Broad Street, Suite 300
Richmond, VA 23219
Main: (804) 529-0000
Fax: (804) 529-0009
lee@floydpc.com
jonathan@floydpc.com

Abigail M. Cody*
**MILBERG, PLLC**
800 S. Gay St., Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080
acody@milberg.com

**Pro Hac Vice Application forthcoming*

*Counsel for Plaintiffs and the Prospective Class*